Nos. 16-1191, 16-1192, 16-1256, 16-1258

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**BELLAGIO, LLC, d/b/a BELLAGIO LAS VEGAS**

Petitioner/Cross-Respondent

v.

**NATIONAL LABOR RELATIONS BOARD**

Respondent/Cross-Petitioner

_____

**THE MIRAGE CASINO-HOTEL, d/b/a THE MIRAGE**

Petitioner/Cross-Respondent

v.

**NATIONAL LABOR RELATIONS BOARD**

Respondent/Cross-Petitioner

_____

**ON PETITIONS FOR REVIEW AND CROSS-APPLICATIONS**
**FOR ENFORCEMENT OF ORDERS OF**
**THE NATIONAL LABOR RELATIONS BOARD**
_____

**BRIEF FOR**
**THE NATIONAL LABOR RELATIONS BOARD**
_____

**USHA DHEENAN**
*Supervisory Attorney*

**MARNI VON WILPERT**
*Attorney*

*National Labor Relations Board*
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-2948**
**(202) 273-2903**

**RICHARD F. GRIFFIN, JR.**
        *General Counsel*
**JENNIFER ABRUZZO**
        *Deputy General Counsel*
**JOHN H. FERGUSON**
        *Associate General Counsel*
**LINDA DREEBEN**
        *Deputy Associate General Counsel*

**National Labor Relations Board**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

| | |
|---|---|
| BELLAGIO, LLC, d/b/a BELLAGIO LAS VEGAS | ) |
| | ) |
| | ) |
| Petitioner/Cross-Respondent | ) |
| | ) |
| v. | ) Nos. 16-1191, 16-1258 |
| | ) |
| NATIONAL LABOR RELATIONS BOARD | ) Board Case No. |
| | ) 28-CA-170899 |
| Respondent/Cross-Petitioner | ) |
| _____ | ) |
| THE MIRAGE CASINO-HOTEL, d/b/a THE MIRAGE | ) |
| | ) |
| | ) |
| Petitioner/Cross-Respondent | ) |
| | ) |
| v. | ) Nos. 16-1192, 16-1256 |
| | ) |
| NATIONAL LABOR RELATIONS BOARD | ) Board Case No. |
| | ) 28-CA-170874 |
| Respondent/Cross-Petitioner | ) |
| _____ | ) |

## CERTIFICATE AS TO PARTIES, RULING, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for the National Labor Relations Board ("the Board") certifies the following:

**A.**    **Parties and Amici:**

1. Bellagio, LLC, d/b/a Bellagio Las Vegas & The Mirage Casino-Hotel, d/b/a The Mirage, were the Respondents before the Board and are the Petitioners and Cross-Respondents before the Court.

2.  The Board is the Respondent and Cross-Petitioner before the Court.

**B.    Rulings Under Review:**

The Companies are seeking review, and the Board is seeking enforcement of, a Board Decision and Order issued against Bellagio on May 23, 2016, reported at 364 NLRB No. 2, and of a Board Decision and Order issued against Mirage on May 23, 2016, reported at 364 NLRB No. 1.  On September 9, 2016, the Court, on its own motion, consolidated the Bellagio and Mirage cases.

**C.    Related Cases**:

None.


s/ Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, N.E.
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
This 6th day of February 2017

# **Glossary**

Bellagio LLC, d/b/a Bellagio Las Vegas &
The Mirage Casino-Hotel d/b/a The Mirage …………..the Companies

National Labor Relations Board……………. …………the Board

Joint Opening Brief of the Companies...………..............Br.

International Union of Operating Engineers Local 501,
AFL–CIO ……..………………………………………...the Union

JA……………………………………………………..Joint Appendix

## **TABLE OF CONTENTS**

**Headings**                                                                    **Page(s)**

Statement of subject matter and appellate jurisdiction ...............................................2

Relevant statutory provisions.......................................................................................3

Statement of the issues presented ...............................................................................4

Statement of the case...................................................................................................4

I.   Statement of facts...................................................................................................5

     A. The surveillance departments .........................................................................6

          a.  The surveillance techs .............................................................................7

          b.  The surveillance operators ....................................................................11

     B.  The security departments...............................................................................12

     C.  The Companies' special operations and observations ............................14

II.  Procedural History ...............................................................................................15

III. The Board's conclusions and orders...................................................................17

Summary of argument.................................................................................................18

Standard of review .....................................................................................................20

Argument......................................................................................................................21

Substantial evidence supports the Board's findings that the surveillance techs
are neither guards nor confidential employees and the Board did not abuse its
discretion in processing the election petitions; therefore, Bellagio and Mirage
violated Section 8(a)(5) and (1) of the Act by refusing to bargain with the
Union.............................................................................................................................21

     A. The Companies have not shown that the surveillance techs are guards
          under the Act and should be excluded from union representation..........22

# TABLE OF CONTENTS

**Headings-Cont'd**                                                     **Page(s)**

1. The Act requires guards to be separated from non-guard employees for collective bargaining ...............................................................22

2. Guards enforce rules to protect the employer's property or the safety of persons on the premises ..................................................25

3. Because the Companies have not shown that surveillance techs enforce company rules, they are not guards...................................28

4. The Companies' Challenges to the Board's Guard Determination are Unpersuasive ..........................................................................31

    a. The Companies' have not presented any evidence that the surveillance techs are statutory guards ...............................31

    b. The Companies rely on inapposite precedent that does not support their claim that the surveillance techs are guards...35

    c. The Companies have not shown there is a potential for divided loyalty ...................................................................38

B. The Companies have not shown that the surveillance techs are confidential employees...........................................................................41

1. Confidential employees assist or act in a confidential capacity to persons who formulate, determine, and effectuate management policies in labor relations ..............................................................41

2. The Companies have not met their burden to prove that the surveillance techs are confidential employees...............................44

C. The Board acted within its discretion and consistently with its precedent in denying the Companies' motions to dismiss the Union's representation petitions ...................................................................................................49

1. The Board reasonably found that the omission on the Union's petitions did not warrant dismissal of these cases ........................52

## <u>TABLE OF CONTENTS</u>

**Headings-Cont'd**                                                                                    **Page(s)**

2.  The Companies failed to show any due process violations or
    prejudice from the Board's rulings ................................................55

Conclusion .................................................................................................62

<u>**TABLE OF AUTHORITIES**</u>

**Cases**                                                        **Page(s)**

*55 Liberty Owners Corp.*,
318 NLRB 308 (1995) .................................................................. 29

*A.W. Schlesinger Geriatic Ctr.*,
267 NLRB 1363 (1983) ................................................................ 26

*Accardi v. Shaughnessy*,
347 U.S. 260 (1954) ..................................................................... 58

*\*Advance Pattern Co.*,
80 NLRB 29 (1948) ........................................... 52, 53, 54, 55, 60, 61

*Alamo-Braun Beef Co.*,
128 NLRB 32 (1960) ............................................................... 54, 55

*Alden Leeds, Inc. v. NLRB*,
812 F.3d 159 (D.C. Cir. 2016) ..................................................... 40

*Alldata Corp. v. NLRB*,
245 F.3d 803 (D.C. Cir. 2001) ..................................................... 50

*Allen Servs. Co.*,
314 NLRB 1060 (1994) ................................................................ 35

*Amalgamated Clothing & Textile Workers Union v. NLRB*,
736 F.2d 1559 (D.C. Cir. 1984) ................................................... 50

*American District Telegraph Co. (Los Angeles, Cal.)*,
83 NLRB 517 (1949) ............................................................... 27, 37

*American District Telegraph Co. (St. Louis, Mo.)*,
83 NLRB 1139 (1949) ............................................................. 27, 37

-------------------

\* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES

**Cases - Cont'd**                                                                  **Page(s)**

*American District Telegraph Co. (Somerville, Mass.),*
128 NLRB 345 (1960) ........................................................ 27, 36

*\*American District Telegraph Co. (Cleveland, Oh.),*
160 NLRB 1130 (1966) ...................................................... 27, 37

*American Hosp. Ass'n v. NLRB,*
499 U.S. 606 (1991) ................................................................ 22

*\*Aria Resort & Casino, LLC,*
363 NLRB No. 24 (Nov. 3, 2015) ................................... 53, 54, 60

*Avecor, Inc. v. NLRB,*
931 F.2d 924 (D.C. Cir. 1991) ................................................ 20

*\*B.F. Goodrich Co.,*
115 NLRB 722 (1956) ................................... 41, 43, 46, 47

*Bakersfield Californian,*
316 NLRB 1211 (1995) ...................................................... 48, 49

*Bellagio, LLC, d/b/a Bellagio Las Vegas,*
364 NLRB No. 2 (2016) ............................................... 2, 3, 5, 17

*\*Boeing Co.,*
328 NLRB 128 (1999) ............................... 24, 25, 29, 35, 36, 38

*Boire v. Greyhound Corp.,*
376 U.S. 473 (1964) ................................................................ 3

*Brewers & Maltsters v. NLRB,*
414 F.3d 36 (D.C. Cir. 2005) ............................................. 21, 23

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES

**Cases-Cont'd**                                                                              **Page(s)**

*Brunswick Bowling Prod.,*
  364 NLRB No. 96, 2016 WL 4492374 (Aug. 25, 2016)................................ 59, 60

*Country Ford Trucks, Inc. v. NLRB,*
  229 F.3d 1184 (D.C. Cir. 2000).................................................................... 20, 21

*Crest Mark Packing Co.,*
  283 NLRB 999 (1987) .......................................................................... 42, 43, 44

*Dependable Parts, Inc.,*
  112 NLRB 581 (1955) ................................................................................ 52, 56

*Desert Hosp. v. NLRB,*
  91 F.3d 187 (D.C. Cir. 1996)............................................................................ 55

*Drivers, Chauffeurs, Warehousemen & Helpers, Local 71, v. NLRB,*
  553 F.2d 1368 (D.C. Cir. 1977)............................................................. 23, 24, 38

*Durham Sch. Servs., LP v. NLRB,*
  821 F.3d 52 (D.C. Cir. 2016)........................................................................ 50, 51

*Electro-Protective Corp. of Ga.,*
  251 NLRB 1141 (1980) .................................................................................... 27

*Fairfax Family Fund, Inc.,*
  195 NLRB 306 (1972) ...................................................................................... 42

*Firestone Synthetic Latex Co.,*
  201 NLRB 347 (1973)................................................................................. 48, 49

*Foodbasket Partners, Ltd.,*
  344 NLRB 799 (2005), *enforced,*
  200 F. App'x 344, 346 (5th Cir. 2006).......................................................... 43, 44

_____

* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES

**Cases-Cont'd**                                                        **Page(s)**

*Freund Baking Co.,*
  330 NLRB 17 (1999) ............................................................................ 3

*Hoover Co.,*
  55 NLRB 1321 (1944) ........................................................................ 44

*Inland Steel Co.,*
  308 NLRB 868 (1992) ........................................................................ 44

*Ladish Co.,*
  178 NLRB 90 (1969) .......................................................................... 43

*Lincoln Park Nursing & Convalescent Home, Inc.,*
  318 NLRB 1160 (1995) ...................................................................... 43

*Local 3, Int'l Bhd. of Elec. Workers v. NLRB,*
  1987 WL 14923 (S.D.N.Y. Jul. 22, 1987) ......................................... 36

*Local 851, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.
   v. NLRB,*
  732 F.2d 43 (2d Cir. 1984) ................................................................ 21

*Medina County Publ'ns,*
  274 NLRB 873 (1985) .......................................................................... 3

*Meyer Mfg. Corp.,*
  170 NLRB 509 (1968) ........................................................................ 26

*MGM Grand Hotel,*
  274 NLRB 139 (1985) ......................................................... 26, 27, 30, 36, 37

*MGM Grand Hotel, LLC,*
  2015 WL 6380396 (Oct. 22, 2015) .................................................... 54

---

\* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES

**Cases - Cont'd**                                                    **Page(s)**

*The Mirage Casino-Hotel d/b/a The Mirage*,
  364 NLRB No. 1 (2016)...................................................... 2, 3, 5, 17, 18

*NLRB v. 675 W. End Owners Corp.*,
  304 F. App'x 911 (2d Cir. 2008) .................................................. 25, 26

*NLRB v. A.J. Tower Co.*,
  329 U.S. 324 (1946) ..................................................................... 50

*NLRB v. Brinks, Inc. of Florida*,
  843 F.2d 448 (11th Cir. 1988) ....................................................... 38

*NLRB v. Case Corp.*,
  995 F.2d 700 (7th Cir. 1993) ......................................................... 44

*NLRB v. Children's Hosp. of Mich.*,
  6 F.3d 1147 (6th Cir. 1993) ........................................................... 24

*NLRB v. Downtown Bid Servs. Corp.*,
  682 F.3d 109 (D.C. Cir. 2012) ...................................................... 50

*\*NLRB v. Hendricks County Rural Elec. Corp.*,
  454 U.S. 170 (1981) .......................................................... 41, 42, 44, 47

*NLRB v. Kentucky River Community Care, Inc.*,
  532 U.S. 706 (2001) ..................................................................... 25

*NLRB v. Superior Cable Corp*,
  246 F.2d 539 (4th Cir. 1957) ............................................... 52, 54, 57

*NLRB v. Welcome-Am. Fertilizer*,
  443 F.2d 19 (9th Cir. 1971) ........................................................... 58

_____

* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES

**Cases-Cont'd**                                                          **Page(s)**

*NLRB v. Wyman-Gordon Co.,*
  394 U.S. 759 (1969).................................................................. 50

*Nova S.E. Univ. v. NLRB,*
  807 F.3d 308 (D.C. Cir. 2015)..................................................... 55

*Packard Motor Car Co. v. NLRB,*
  330 U.S. 485 (1947).................................................................. 20

*Peco Energy Co.,*
  322 NLRB 1074 (1997)............................................................. 35

*Pullman, Inc.,*
  214 NLRB 762 (1974)............................................................... 44

*Rhode Island Hosp.,*
  313 NLRB 343 (1993)......................................................... 26, 35

*Rush Univ. Med. Ctr. v. NLRB,*
  833 F.3d 202 (D.C. Cir. 2016)..................................................... 50

*Serv. Corp. Int'l v. NLRB,*
  495 F.3d 681 (D.C. Cir. 2007)..................................................... 50

*Thomas Jefferson Univ. v. Shalala,*
  512 U.S. 504 (1994).................................................................. 50

*Truck Drivers Local Union No. 807, v. NLRB,*
  755 F.2d 5 (2d Cir. 1985)..................................................... 24, 38

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951).................................................................. 21

_____

* Authorities upon which we chiefly rely are marked with asterisks.

## <u>TABLE OF AUTHORITIES</u>

**Cases-Cont'd**　　　　　　　　　　　　　　　　　　　　　　　　　**Page(s)**

*Wackenhut Corp. v. NLRB,*
  178 F.3d 543 (D.C. Cir. 1999)......................................................... 23, 24

*Waste Management of Puerto Rico,*
  339 NLRB 262 (2003), *enforced,*
  359 F.3d 36 (1st Cir. 2004).................................................................. 43

*Wells Fargo Alarm Servs. v. NLRB,*
  533 F.2d 121 (3d Cir. 1976) ...............................................21, 27, 28, 39

*Wells Fargo Alarm Servs.,*
  289 NLRB 562 (1988) ......................................................................... 35

*Wright Mem'l Hosp.,*
  255 NLRB 1319 (1980) ....................................................................... 26

**Statutes:**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)

Section 7 (29 U.S.C. § 157) ................................................................... 22
Section 8(a)(1) (29 U.S.C. § 158(a)(1))................................... 4, 5, 17, 21
Section 8(a)(5) (29 U.S.C. § 158(a)(5))................................... 4, 5, 17, 21
Section 9(b) (29 U.S.C. § 159(b))........................................................... 22
Section 9(b)(3) (29 U.S.C. § 159(b)(3)) .............. 16, 22, 24, 25, 31, 39, 40, 41
Section 9(c) (29 U.S.C. § 159(c)) .............................................. 3, 15, 52
Section 9(d) (29 U.S.C. § 159(d))............................................................. 3
Section 10(a) (29 U.S.C. § 160(a)) ........................................................... 2
Section 10(e) (29 U.S.C. § 160(e)) ...................................................... 2, 40
Section 10(f) (29 U.S.C. § 160(f)) ............................................................ 2

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

# <u>TABLE OF AUTHORITIES</u>

**Regulations:**                                                                                                    **Page(s)**

29 C.F.R. § 102.60 ............................................................................... 51
29 C.F.R. § 102.61(a)...................................................................... 53, 59
29 C.F.R. § 102.61(a)(8).......................................................................... 53
29 C.F.R. § 102.63(b)(3)(i)...................................................................... 59
29 C.F.R. § 102.66(d) .............................................................................. 59
29 C.F.R. § 102.121 ................................................................................ 61

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

## Nos. 16-1191, 16-1192, 16-1256, 16-1258
_____

## BELLAGIO, LLC, d/b/a BELLAGIO LAS VEGAS

**Petitioner/Cross-Respondent**

**v.**

## NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

_____

## THE MIRAGE CASINO-HOTEL, d/b/a THE MIRAGE

**Petitioner/Cross-Respondent**

**v.**

## NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

_____

## ON PETITIONS FOR REVIEW AND CROSS-APPLICATIONS
## FOR ENFORCEMENT OF ORDERS OF
## THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

_____

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

The Bellagio Las Vegas case is before the Court on the petition of Bellagio, LLC ("Bellagio") for review, and the cross-application of the National Labor Relations Board ("the Board") for enforcement, of a Board Decision and Order issued against Bellagio on May 23, 2016, and reported at 364 NLRB No. 2.  The Mirage Casino-Hotel case is before the Court on the petition of The Mirage Casino-Hotel, ("Mirage") for review, and the cross-application of the Board for enforcement, of a Board Decision and Order issued against Mirage on May 23, 2016, and reported at 364 NLRB No. 1.  On September 9, the Court, on its own motion, consolidated the Bellagio and Mirage cases.

The Board had jurisdiction over the unfair-labor-practice proceedings below under Section 10(a), 29 U.S.C. § 160(a), of the National Labor Relations Act, as amended ("the Act"), 29 U.S.C. §§ 151, et seq.  The Board's Orders are final under Section 10(e) of the Act, 29 U.S.C. § 160(e).  The petitions for review and the Board's cross-applications for enforcement were timely, as the Act places no time limit on those filings.  This Court has jurisdiction over the petitions and cross-applications pursuant to Section 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f).

The Board's unfair-labor-practice Orders are based, in part, on findings made in underlying representation proceedings, *Bellagio, LLC d/b/a Bellagio Las Vegas*, Board Case No. 28-RC-154081, and *The Mirage Casino-Hotel d/b/a The Mirage*, Board Case No. 28-RC-154083.  Pursuant to Section 9(d) of the Act, 29 U.S.C. § 159(d), the record before this Court therefore includes the records in those proceedings.  Section 9(d) authorizes judicial review of the Board's actions in a representation proceeding for the limited purpose of deciding whether to "enforc[e], modify[], or set[] aside in whole or in part the [unfair-labor-practice] order of the Board . . . ."  29 U.S.C. § 159(d); *see also Boire v. Greyhound Corp.*, 376 U.S. 473, 476-79 (1964).  The Board retains authority under Section 9(c) of the Act, 29 U.S.C. § 159(c), to resume processing the representation cases in a manner consistent with the ruling of the Court in the unfair-labor-practice cases.  *See Freund Baking Co.*, 330 NLRB 17, 17 & n.3 (1999); *Medina County Publ'ns*, 274 NLRB 873, 873 (1985).

## RELEVANT STATUTORY PROVISIONS

Relevant sections of the Act are contained in the Statutory Addendum.

4

## STATEMENT OF THE ISSUES PRESENTED

The ultimate issue in this case is whether substantial evidence supports the Board's findings that Bellagio and Mirage (collectively, "the Companies") violated Section 8(a)(5) and (1) of the Act by refusing to bargain with their employees' certified bargaining representative, International Union of Operating Engineers Local 501, AFL–CIO ("the Union").  The contested issues before this Court are:

I.    Does substantial evidence support the Board's finding that the surveillance techs are not guards under the Act, where they install and maintain surveillance and security cameras and other security equipment, and do not enforce rules to protect the employer's property or persons on the premises?

II.   Does substantial evidence support the Board's finding that the surveillance techs are not confidential employees, where there was no evidence that they assist and act in a confidential capacity to persons who formulate, determine, and effectuate labor policies?

III.  Did the Board act within its broad discretion to oversee union representation elections when denying the Companies' motions to dismiss the Union's election petitions?

## STATEMENT OF THE CASE

These unfair-labor-practice cases arise from the Companies' admitted refusals to bargain with the Union, which the Board certified as the exclusive bargaining representative of units of surveillance techs working at the Bellagio and

Mirage hotels and casinos in Las Vegas.  (JA 444-45, 886-87.)[1]  In the underlying

representation proceedings, the Companies challenged the appropriateness of the

bargaining units, arguing that that the surveillance techs may not be represented by

the Union because they are either guards or confidential employees as defined by

the Act, and that the Union's election petitions were invalid.  Having found the

petitions valid and the units appropriate (JA 444-45 & n.1, 886-87 & n.2), the

Board held (JA 445, 887) that the Companies' refusals to bargain violated Section

8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1).  The facts and procedural

histories relevant to both the representation and unfair-labor-practice proceedings

are set forth below.

I.    STATEMENT OF FACTS

Bellagio and Mirage each operate a casino and hotel in Las Vegas, Nevada,

which are owned by the same parent company, MGM Resorts International.

(JA 431, 444, 873-74, 886; JA 362.)  To ensure the integrity of their gaming

operations and to protect employees, guests, and their properties, the Companies

have each established a Surveillance Department and a separate Security

---

[1]  "JA" refers to the Joint Appendix and "Br." refers to Bellagio's and Mirage's joint opening brief.  Where applicable, references preceding a semicolon are to the Board's findings; those following are to the supporting evidence.

6

Department.  (JA 434-35, 876.)  The Surveillance Department is responsible for monitoring the gaming areas of the casino, and the Security Department is responsible for monitoring the non-gaming areas.  (JA 434-35, 876-77; JA 198, 519-20, 543-44.)

### A. The Surveillance Departments

The Companies' Surveillance Departments are responsible for protecting the Companies' assets, enhancing the safety of employees and guests in the gaming areas, and complying with state gaming regulations.  (JA 433-43, 876; JA 67, 72-73, 85, 519-21.)  To surveil their gaming activities, the Companies utilize a closed-circuit television (CCTV) system, which includes servers, hard drives, and a network of hundreds of surveillance cameras that record and transmit live video footage of the gaming areas and count rooms.  (JA 434, 876; JA 187-89, 543-44.)  The cameras record the digital video footage, which is processed in a central server room and then sent next door to the surveillance monitor room for viewing.  (JA 434, 876; JA 78, 530-32.)

The Companies' surveillance monitor rooms have 26 to 36 monitors that receive live video footage covering the gaming areas of the casino.  (JA 434, 876; JA 74, 526-27.)  Two groups of employees work within the Companies'

surveillance departments:  the surveillance techs and the surveillance operators.

(JA 434, 876; JA 73-77, 524.)

### a.  The Surveillance Techs

The Companies each employ three surveillance techs and one lead technician to design, install, and maintain the surveillance CCTV system.  (JA 434, 876; JA 76-77, 539-40, 667.)  The surveillance camera system changes frequently, requiring the surveillance techs to add, remove, reposition, and refocus cameras throughout the casino.  (JA 434, 876; JA 98, 537.)  For example, when the casino hosts a special gaming event, such as a baccarat tournament, the surveillance techs are responsible for installing the cameras to monitor the special event.  (JA 434, 876; JA 98, 185-86, 554-55.)  The surveillance techs install and adjust the camera coverage with the approval of the Director of Surveillance and obtain final approval from the State gaming authority.  (JA 434, 876; JA 187, 189-91, 411-14, 546.)  The techs are also responsible for making sure that any surveillance system repairs are completed within the timeframe established by State gaming regulations.  (JA 434, 876; JA 71-72, 535-36.)

Bellagio's surveillance techs enter the surveillance monitor room to check in and out for their shifts, but they primarily work next door in the server/equipment room and in their shop on the mezzanine level of the casino.  (JA 435; JA 77.)

They do not maintain 24-hour coverage at the casino. (JA 435; JA 83.) Instead, they work set hours from 3:00 a.m. to 2:00 p.m., and are on call after 2:00 p.m. to address any urgent equipment malfunctions. (JA 435; JA 83.) They begin their work shift in the early morning hours because they are often tasked with moving cameras around on the casino floor, and Bellagio prefers to do that when there are few patrons in the gaming areas. (JA 83.) Bellagio's surveillance techs wear dark pants and a polo shirt as their uniform, and their tools include screw drivers and screw guns. (JA 435; JA 222-23.) Surveillance techs are not authorized to carry weapons. (JA 435; JA 44, 226.)

Mirage's surveillance techs have their own office where they spend approximately 45 minutes at the beginning of each shift to clock in and review their emails, work orders, and the day's duties. They spend the last 45 minutes of each shift in their office completing work orders and informing the lead tech of items that need to be replaced or ordered. (JA 877; JA 708-09.) They spend the rest of their shifts in various areas of the casino working on the surveillance system, where they use tools such as screw drivers and wire connectors, and equipment such as ladders or lifts. (JA 877; JA 536, 698.) Mirage's surveillance techs do not maintain 24-hour coverage at the casino. Instead, they work one shift during the day, either from 6:00 a.m. to 2:00 p.m., or 7:00 a.m. to 3:00 p.m., with

one tech on call from the end of the day's shift to address any urgent equipment malfunctions. (JA 877; JA 540, 667.) They wear dark pants and a polo shirt as their uniform, and are not authorized to carry weapons. (JA 877-78; JA 707, 781.)

The Companies' surveillance techs have administrative access to the surveillance systems, including the servers, surveillance storage, and hard drives. (JA 434, 876-77; JA 78-79, 542, 560-61.) They are granted this administrative access in order to maintain the system and troubleshoot issues, to add or delete users as employees join and leave the company, and add or delete security alarms. (JA 434, 877; JA 96-97, 208-09, 575, 716, 756-58.) The surveillance techs also perform maintenance for the Companies' electronic door lock systems and issue key fobs to new employees at management's direction, and they possess a master key which grants them physical access to restricted locations on the property. (JA 434-35, 877; JA 80, 96-97, 202, 716-18, 722-23.) The Companies' Directors of Surveillance have the same administrative access that the surveillance techs do. (JA 434-35, 877; JA 79, 558.)

The surveillance techs do not have plenary authority to alter the Companies' surveillance systems, and must obtain necessary permissions from their respective Director of Surveillance before making any changes or else risk disciplinary action. (JA 434-35, 876-77; JA 236-37, 249, 562-66, 716, 720-21.) And the techs

are limited by the Companies' policies to enter only the areas in which they need

access for their work.  (JA 434-35, 877; JA 256, 722-23.)  There have been no

instances at either Bellagio or Mirage when a surveillance tech used his system

access privileges for misconduct.  (JA 434-35, 877; JA 236-37, 373-75, 718-20,

824-27.)

  Surveillance techs do not monitor the live camera feeds for misconduct, and

they do not document or report any instances of rule violations.  (JA 435, 877;

JA 85, 255, 710.)  At Bellagio, the surveillance techs do not patrol the hallways or

have any input into the determination of whether an employee or patron was

involved in misconduct when security officers are investigating such incidents.

(JA 435-36; JA 319-20, 324-25.)  Similarly, at Mirage, even in situations where a

surveillance tech happens to observe a crime, the tech's duty is to report it to

surveillance or security and act as a witness, but the tech has no obligation to

approach the situation or individuals involved.  (JA 878; JA 714-15.)

  The surveillance techs do not have any training in restraining individuals on

the Companies' properties and company policy does not permit them to do so.

(JA 435, 878; JA 227, 234-36, 699.)   For example, surveillance techs do not

respond when guests are caught cheating, fighting, or engaging in other

misconduct.  (JA 435, 878; JA 234-36, 699, 779, 782.)  Instead, the surveillance

techs only respond to situations involving surveillance equipment that must be repaired or repositioned, such as if a camera dome has come loose and is at risk of falling.  (JA 435, 878; JA 253, 785.)

### b.  The Surveillance Operators

The Companies' Surveillance Operators operate the surveillance CCTV systems.  The Companies refer to the operators as their "frontline employee[s]," as they monitor the casino floor via the live camera feeds looking for any suspicious activity and recording and reporting what occurs.  (JA 434, 876; JA 75, 530, 685.) The operators document their observations and any serious policy violations that could result in future litigation or prosecution.  (JA 434, 876; JA 75-76, 524-26.) The surveillance operators maintain 24-hour coverage at the casino, with two to four operators on each shift in addition to the surveillance supervisors.  (JA 434, 876; JA 75, 170-71, 526, 529.)  Each operator has a workstation, a section of monitors to which they are assigned, and a security radio which they monitor. (JA 434, 876; JA 76, 526, 529.)

The surveillance techs may provide technical assistance to the surveillance operators if the operators encounter difficulty in retrieving video from the cameras or hard drives.  They do not assist the operators in monitoring the live camera feeds or recordings for misconduct.  (JA 435, 877; JA 82, 732.)  The surveillance

techs also check to see if any of the monitor room equipment needs maintenance, including updating the surveillance operators' work stations and ensuring the operators have appropriate access to cameras.  (JA 435, 877; JA 82, 88, 534.)

## B. The Security Departments

The Companies' separate Security Departments have their own staff and separate responsibilities for ensuring the safety and security of guests, employees, and the Companies' assets – in contrast to the Surveillance Department, which monitors gaming areas.  (JA 435, 876; JA 262-63, 393-94, 727, 743-47.)  The security officers wear slacks and a blazer; they carry handcuffs and first aid equipment, and some of the plain-clothes officers carry weapons.  (JA 435, 877-78; JA 305, 316, 697, 776-77, 781.)  Security officers are assigned to posts throughout the property where they patrol an assigned area, observing for problems or misconduct.  (JA 435, 877; JA 263-64, 337-39, 743-44.)  Security Officers are obligated to engage in situations involving misconduct, such as when patrons are caught cheating, including by restraining and handcuffing patrons or escorting persons off the property.  (JA 435, 878; JA 309, 779-80, 785.)

The Companies' Security Departments also have their own CCTV system of approximately 1,400 cameras to observe the non-gaming areas, such as the perimeters of the property, the main lobbies, back of the house hallways, retail

13

areas, and convention areas.  (JA 435, 877; JA 267, 743-44.)  Those cameras feed

into displays in the Security Department's own monitor room, which is located

next door to the Surveillance Department's monitor room.  (JA 435, 877; JA 266,

748.)  Security officers are assigned on a rotating basis to work in the monitor

room and monitor the live video feed for misconduct.  (JA 435, 876; JA 267-69,

272, 751.)  If an incident occurs, the security officers download the video

recording to a file, and burn it to a DVD if necessary.  (JA 434, 876; JA 294, 759.)

Just as the surveillance techs maintain and install the surveillance cameras,

they also maintain and install the security cameras, except that the security system

is not covered by the State gaming regulations.  (JA 435-36, 877; JA 268, 544,

752.)  The surveillance techs do not monitor the security video feed for

misconduct; instead, they are only responsible for making sure the security

cameras are working and for assisting the security department in retrieving any

videos stored in the cameras.  (JA 435-36, 877-78; JA 325, 327, 752-53.)

Bellagio's Vice President of Security, and Mirage's Director of Security, have the

same access to the server rooms and security systems that the surveillance techs

do.  (JA 435, 877; JA 273, 568.)

14

### C.  The Companies' Special Operations and Observations

Once or twice a month, the Companies' Security Departments perform investigations, known as "special operations," in which the department investigates reports of misconduct or violations of company rules.  (JA 436, 878; JA 292-94, 678, 730, 761.)  In addition, the Security Departments perform "special observations" of casino employees, such as a dealer who is suspected of improper activity.  (JA 436, 878; JA 215, 678.)  Surveillance techs provide limited technical assistance for the camera operation during some of the special operations and observations when needed.  (JA 436, 878; JA 217-18, 680-81.)  As needed, techs develop and install recording devices based on the requirements of the investigation, which may include the use of visible or covert cameras.  (JA 436, 878; JA 292, 676-77, 761.)

Surveillance techs do not have any role in the special operations or observations other than ensuring the correct operation of the cameras and retrieval of the video footage.  (JA 436, 878; JA 218, 295, 731-32.)  While the surveillance techs are frequently aware of the nature of the investigation in order to arrange correct camera coverage, they do not necessarily know who is being investigated.  (JA 436, 878; JA 217-18, 676-77, 731-32.)  They do not interview anyone or report on anything they happen to observe.  The surveillance techs are not involved in the

investigation's outcome.  (JA 436, 878; JA 295, 676-77, 731-32.)  They are not

involved in imposing punishment or disciplinary action.  Nor do they develop

company labor relations policies as a result of the investigations, adjust grievances,

or participate in the administration of collective-bargaining contracts.  (JA 438,

880; JA 259, 730-32.)

## II.    PROCEDURAL HISTORY

In June 2015, the Union filed petitions for certification under Section 9(c) of

the Act, 29 U.S.C. § 159(c), seeking to represent bargaining units of the Bellagio's

and Mirage's full-time and part-time surveillance techs.[2]  (JA 1, 452.)  The

Companies challenged the petitioned-for units as inappropriate, arguing that the

surveillance techs are either guards within the meaning of Section 9(b)(3) of the

Act and must be represented by a guard-only union, or because the surveillance

techs are confidential employees and therefore  are excluded from bargaining units

under the Board's jurisprudence.  The Companies also moved to dismiss the

Union's petitions for certification, arguing that they were insufficient because the

Union had not checked the appropriate box on the petition form noting whether the

---

[2]  The petitioned-for bargaining units consist of "[a]ll full-time and regular part-time surveillance techs."  The units exclude "all other employees, including office, clerical, professional, guards, and supervisors as defined in the National Labor Relations Act."  (JA 444-45, 886-87.)

Union had demanded recognition from the Companies before filing the petitions.
(JA 432, 874.)  On June 19, the Regional Director denied the Companies' motions
to dismiss.  (JA 895-96, 898-99.)

On June 30, 2015, after a hearing, the Board's Regional Director issued a
Decision and Direction of Election in both cases, finding that the petitioned-for
units were appropriate and again declining to dismiss the Union's petitions.
(JA 431-42, 873-84.)  The Companies requested review of the Regional Director's
Decisions before the Board.  Both representation elections took place on
July 7, 2015, and the surveillance techs voted unanimously in favor of
representation by the Union in both cases.  (JA 897, 900.)  The Union was certified
as the collective-bargaining representative of the Companies' units of surveillance
techs on October 28, 2015.

The Board (Chairman Pearce and Members Hirozawa and McFerran)
denied the Companies' requests for review of the Regional Director's decisions in
both cases on November 18, 2015.  On December 18, 2015, and again on
February 26, 2016, the Union requested that the Companies meet to negotiate
collective-bargaining agreements.  Since January 12, 2016, the Companies, by
letter, have admittedly refused to do so in order to test the validity of the Union's
certifications.  (JA 444-45, 886-87.)  The General Counsel issued complaints

against the Companies, alleging that their refusals to bargain violated Section

8(a)(5) and (1) of the Act, 29 U.S.C. § 8(a)(5) and (1), and moved for summary

judgment before the Board.

## III.    THE BOARD'S CONCLUSIONS AND ORDERS

On May 23, 2016, a three-member panel of the Board (Chairman Pearce;

Members Hirozawa and McFerran) granted summary judgment in both cases,

finding that the Companies violated the Act as alleged.  *See The Mirage Casino-*

*Hotel d/b/a The Mirage*, 364 NLRB No. 1; *Bellagio, LLC, d/b/a Bellagio Las*

*Vegas*, 364 NLRB No. 2.  In its decisions, the Board noted that all representation

issues raised by the Companies were or could have been litigated in the prior

representation proceedings.  (JA 444, 886.)  To remedy the unfair labor practices,

the Board's Orders require the Companies to cease and desist from failing and

refusing to recognize and bargain with the Union or, in any like or related manner,

interfering with, restraining, or coercing employees in the exercise of their rights

under the Act.  Affirmatively, the Orders require the Companies to bargain with

the Union upon request and, if an understanding is reached, to embody that

understanding in a signed agreement.  The Orders also require the Companies to

post a remedial notice.  (JA 445-46, 887-88.)

18

## SUMMARY OF ARGUMENT

The Companies admit that they refused to bargain with the Union in order to challenge the Board's certifications of the Union as the surveillance techs' bargaining representative. Those challenges are without merit, as substantial evidence supports the Board's findings that the techs are neither guards nor confidential employees as the Companies claim. Likewise, the Companies have not shown that the Board abused its discretion in denying their motions to dismiss the election petitions simply because the Union submitted the petition form with a technical omission, which was swiftly corrected at the pre-election hearing.

1.    The Board acted within its broad discretion in finding the bargaining units of surveillance techs appropriate because they are not guards under the Act. To be classified as a guard, an employee must enforce the employer's rules against other employees and persons on the employer's property. Substantial evidence supports the Board's finding that the surveillance techs are not guards because their duties in installing and maintaining the Companies' security and surveillance cameras and equipment do not require them to enforce any of the Companies' rules. Instead, the surveillance techs only provide technical support for the equipment that the surveillance operators and security guards use to enforce rules. The Board's finding is consistent with longstanding court-approved Board

precedent holding that employees who install and maintain the employer's security equipment – but have no duty to monitor the premises or report rule violations – are not guards within the meaning of the Act.

2.      Substantial evidence also supports the Board's finding that the surveillance techs are not confidential employees under its longstanding labor-nexus test.  The Companies provided no evidence that the surveillance techs assist in a confidential capacity persons who formulate, determine, and effectuate management policies in labor relations.  Mere access to confidential information does not suffice.

3.      Finally, the Companies have not shown that the Board abused its discretion when denying their motions to dismiss the Union's petitions.  The Companies' motions were based solely on the Union's failure to check a box on the petition form, indicating whether it had asked the Companies to voluntarily recognize it as the bargaining representative of their surveillance techs.  Any technical defects were corrected when the Union made such requests at the hearings.  The Board's decision was reasonable and consistent with its long-standing precedent regarding requests for recognition, and the Companies have not claimed or suffered any prejudice.

## STANDARD OF REVIEW

The Supreme Court and this Court have recognized that "determining what constitutes an appropriate bargaining unit 'involves of necessity a large measure of informed discretion.'"[3]  Courts will uphold the Board's determination that a disputed employee should be included in a bargaining unit if the Board's decision is supported by substantial evidence.[4]  Under the substantial-evidence standard, a reviewing court may not displace the Board's choice between two fairly conflicting views, even if the court "would justifiably have made a different choice had the matter been before it de novo."[5]  In reviewing the record, this Court will thus accord "substantial deference to inferences drawn from the facts," as well as to "'the reasoned exercise of [the Board's] expert judgment.'"[6]

_____

[3]  *Country Ford Trucks, Inc. v. NLRB*, 229 F.3d 1184, 1189 (D.C. Cir. 2000) (quoting *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 491 (1947)).

[4]  *See, e.g.*, *Local 851, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. NLRB*, 732 F.2d 43, 44 (2d Cir. 1984) ("We are satisfied that the Board's finding that the subject employees are 'guards' is supported by substantial evidence . . . ."); *Wells Fargo Alarm Servs. v. NLRB,* 533 F.2d 121, 125 (3d Cir. 1976) (same).

[5]  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

[6]  *Country Ford Trucks*, 229 F.3d at 1189 (quoting *Avecor, Inc. v. NLRB*, 931 F.2d 924, 928 (D.C. Cir. 1991)).

21

# ARGUMENT

**SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDINGS THAT THE SURVEILLANCE TECHS ARE NEITHER GUARDS NOR CONFIDENTIAL EMPLOYEES AND THE BOARD DID NOT ABUSE ITS DISCRETION IN PROCESSING THE ELECTION PETITIONS; THEREFORE, BELLAGIO AND MIRAGE VIOLATED SECTION 8(a)(5) AND (1) OF THE ACT BY REFUSING TO BARGAIN WITH THE UNION**

"Under [S]ection 8(a)(5) of the Act, it is an unfair labor practice for an employer to refuse to bargain with the exclusive bargaining representative of its employees[.]"[7]  A violation of Section 8(a)(5) results in a derivative violation of Section 8(a)(1), which makes it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [S]ection [7]" of the Act.[8]  Here, the Companies admittedly refused to recognize and bargain with the Union, but argue that the Union's certifications were improper because, in the Companies' opinions, the surveillance techs are either guards or confidential employees under the Act, and the Union's petitions for certification were defective. Accordingly, the question before the Court is whether the Board properly rejected those arguments and certified the Union.

---

[7] *Brewers & Maltsters v. NLRB*, 414 F.3d 36, 41 (D.C. Cir. 2005).

[8] *Id.*

### A. The Companies Have Not Shown that the Surveillance Techs Are Guards under the Act and Should Be Excluded from Union Representation

#### 1. The Act requires guards to be separated from non-guard employees for collective bargaining

Section 7 of the Act provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing . . . ."  29 U.S.C. § 157.  "[I]n order to assure to employees the fullest freedom in exercising the rights guaranteed by [the Act]," Section 9(b) empowers the Board to decide in each case whether "the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . ."[9]  But Section 9(b) also requires statutory guards to be separated from all other employees for the purposes of collective bargaining.  Specifically, the Board cannot find appropriate a bargaining unit which includes both guards and non-guard employees.  And, as is relevant here, the Board cannot certify a labor organization to represent a unit of guards if it also represents non-guard employees, or is directly or indirectly affiliated with a labor organization that represents non-guard employees.[10]

---

[9]  29 U.S.C. § 159(b); *see Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 609-10 (1991).

[10]  Section 9(b)(3), 29 U.S.C. § 159(b)(3), states that:

23

Because it is undisputed that the Union represents non-guard employees (Br. 27), the Union could not be certified as the bargaining representative of the surveillance techs if they were classified as statutory guards. Instead, the techs would have to join a different, guard-only union.

As this Court has explained, Congress chose to separate guards from all other employees for the purposes of collective bargaining in order "to minimize the danger of divided loyalty that arises when a guard is called upon to enforce the rules of his employer against a fellow union member."[11] The potential for such a conflict of interest could arise, for example, during periods of strikes or labor

---

[T]he Board shall not . . . (3) decide that any unit is appropriate for [collective bargaining] if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

[11] *Drivers, Chauffeurs, Warehousemen & Helpers, Local 71, v. NLRB*, 553 F.2d 1368, 1373 (D.C. Cir. 1977); *accord Wackenhut Corp. v. NLRB*, 178 F.3d 543, 546 (D.C. Cir. 1999); *Brewers & Maltsters*, 414 F.3d at 42.

unrest.[12]  But while the Board must balance the employer's need for security during a strike with employees' rights to choose union representation, the Board has been careful not to interpret the definition of a statutory guard too broadly.

To be certified by the Board, guards must be isolated in their bargaining units and may only be represented by certain unions, in order to separate them from non-guard employees.  Therefore, a finding that employees are guards severely limits their rights to freely choose their representative.[13]  Accordingly, this Court has traditionally granted great deference to the Board's determination of which employees qualify as statutory guards, stating that, "[w]e must be particularly wary not to substitute judgment where, as here, the agency's expertise illuminates the meaning of an open-ended statutory term."[14]  Because the

---

[12]  *Wackenhut*, 178 F.3d at 546; *Boeing Co.*, 328 NLRB 128, 130 (1999) (conflict of interest may arise for guards during strike by non-guard employees represented by the same union).

[13]  *NLRB v. Children's Hosp. of Mich.*, 6 F.3d 1147, 1150 (6th Cir. 1993) (employer may voluntarily recognize a guard/non-guard union but Board cannot compel such recognition; therefore, guards may lawfully join a union that represents non-guards but "will not have all the rights normally associated with belonging to a union"); *accord Truck Drivers Local Union No. 807 v. NLRB*, 755 F.2d 5, 8 (2d Cir. 1985) (§9(b)(3) of the Act "limits the organizational rights of guards – they must be in units segregated from nonguard employees").

[14]  *Local 71*, 553 F.2d at 1374 (Board's determination of guard issues "is entitled to judicial deference"); *accord Children's Hosp.*, 6 F.3d at 1151.

limitation on their choice of bargaining representative is an exception to the general rule that employees have the right to bargain collectively through any representative of their own choosing, the burden is on the party asserting guard status to prove it.[15]

### 2. Guards enforce rules to protect the employer's property or the safety of persons on the premises

Section 9(b)(3) of the Act defines a guard as an "individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises."[16] Based on that statutory text, the Board has determined that "[g]uard responsibilities include those typically associated with traditional police and plant security functions," such as "enforcement of rules directed at other employees; the possession of authority to compel compliance with those rules; training in security procedures; weapons training and possession; participation in security rounds or patrols; the monitor and control of access to the employer's premises; and wearing

---

[15] *Cf. NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 711 (2001) (burden of proving supervisory status is on party asserting it).

[16] 29 U.S.C. § 159(b)(3).

guard-type uniforms or displaying other indicia of guard status."[17]  The Board has

found that in order to be classified as a statutory guard, the employee must, at a

minimum, be responsible for monitoring the employer's property and reporting

rule violations on the employer's premises.[18]  Even having broad access to the

employer's property and the ability to admit others onto the property is not enough

to qualify as a guard when there is no evidence that the employee has a duty to

monitor the property or the authority to enforce rules.[19]

---

[17]  *Boeing Co.*, 328 NLRB at 130; *accord NLRB v. 675 W. End Owners Corp.*, 304 F. App'x 911, 914 (2d Cir. 2008) (summary opinion).

[18]  *See, e.g.*, *Rhode Island Hosp.*, 313 NLRB 343, 346-47 (1993) (guards "charged with the responsibility of being on the look out [sic] for and reporting security problems or rules violations"); *MGM Grand Hotel*, 274 NLRB 139, 140 (1985) (finding "operators of the [employer's security] system" were guards, in part because they "monitor[ed] and report[ed] possible security problems and infractions and possible life-endangering situations"); *A.W. Schlesinger Geriatric Ctr.*, 267 NLRB 1363, 1364 (1983) (guards "possess and exercise responsibility to observe and report infractions, as this is an essential step in the procedure for enforcement of the [employer's] rules"); *Wright Mem'l Hosp.*, 255 NLRB 1319, 1320 (1980) (ambulance drivers were guards when they were, among other things, "required to make security rounds" of the employer's premises, and "[i]f they discover[ed] an irregularity or violation, they [were to] . . . report it to the department head where it occurs").

[19]  *Meyer Mfg. Corp.*, 170 NLRB 509, 509-10 (1968) (rejecting guard status where employee had keys to plant and did not admit employees without plant manager's authorization, but was not required to keep people out and had no authority to enforce rules to protect property or persons on premises); *see also 675 W. End Owners Corp.*, 304 F. App'x at 914 (apartment-building doormen who controlled

As is relevant here, the Board and the Courts have long held that employees who merely install and maintain security system equipment (such as alarms and cameras) without any responsibility to monitor the employer's premises or report or correct infractions, are not guards under the Act.[20]  As the Board has explained, employees who are "merely [] working on [the employer's] protective equipment, do not come within the statutory definition of guards as they are not individuals who enforce rules to protect property or the safety of persons on customers' premises."[21]  For that reason, the Board has found that technicians must enforce rules to be deemed guards under the Act.[22]  For example, the Third Circuit found

_____

visitor access not guards where they were not required to enforce rules against other employees).

[20]  *Wells Fargo Alarm Servs.*, 533 F.2d at 123-24; *Am. Dist. Tel. Co. (Cleveland, Oh.)*, 160 NLRB 1130, 1134 (1966) (employees who are "responsible for new installations, periodic inspections, and maintenance and repairs of [the employer's] protective equipment" are not guards); *Am. Dist. Tel. Co. (Somerville, Mass.)*, 128 NLRB 345, 346 (1960) (same); *Am. Dist. Tel. Co. (Los Angeles, Cal.)*, 83 NLRB 517, 520 (1949) (same); *Am. Dist. Tel. Co. (St. Louis, Mo.)*, 83 NLRB 1139, 1141 (1949) (same).

[21]  *Am. Dist. Tel. Co. (Cleveland, Oh.)*, 160 NLRB at 1138; *accord Am. Dist. Tel. Co. (Los Angeles, Cal.)*, 83 NLRB at 520; *Am. Dist. Tel. Co. (St. Louis, Mo.)*, 83 NLRB at 1141.

[22]  *See Electro-Protective Corp. of Ga.*, 251 NLRB 1141, 1142 (1980) (employee who installed and maintained alarms was a guard because he checked identification, prohibited entry by unauthorized persons, and faced possible

that servicemen were not statutory guards when they were responsible for the routine servicing of the alarm devices and responded to alarms solely to perform any necessary repairs.[23]  The servicemen, as the court noted, did not search for burglars themselves, nor restrain individuals from entering the employer's premises, but rather, waited for the police to arrive when dispatched to the scene of a triggered alarm.[24]

As discussed below, neither Mirage nor Bellagio have offered any evidence that their surveillance techs engage in guard responsibilities.  To the contrary, ample evidence in the record supports the Board's findings that the surveillance techs are not statutory guards.

### 3. Because the Companies have not shown that surveillance techs enforce company rules, they are not guards

Substantial evidence supports the Board's finding (JA 438, 881) that the Companies did not support their claim that surveillance techs perform guard duties

---

personal confrontation with intruders); *see also MGM Grand Hotel*, 274 NLRB at 140 n.10 (guard status where employees observed and reported infractions, "an essential step in the procedure for the enforcement of the employer's rules") (quotation omitted)).

[23]   *Wells Fargo Alarm Servs.*, 533 F.2d at 123-24.

[24]   *Id.*

or enforce the Companies' rules.  As the Board found (JA 438-39, 881-82) the

surveillance techs' job duties are limited to installing and maintaining the

surveillance and security CCTV systems and related equipment under the direction

of management, including installing and maintaining cameras and alarms, and

dispensing the electronic key fobs at management's direction for the electronic

door lock system.  The Board further found (JA 438, 881) that the Companies

produced no evidence showing that the surveillance techs enforce rules against

anyone, nor are they responsible for even monitoring the employers' property or

reporting rule or safety violations.  They do not monitor camera feeds for

misconduct nor do they document or report any rule violations.  They are not

trained to intervene in situations that require restraining patrons or other

individuals on the Companies' properties.[25]  They do not respond in situations

when guests are caught cheating, fighting, or engaging in other misconduct, and

company policy does not permit surveillance techs to restrain individuals.  As both

Companies' Directors of Surveillance explained, the surveillance techs' duty to

alert operators in the monitor room to any misconduct they happen to see is no

---

[25] *See Boeing Co.*, 328 NLRB at 129, 131 (employees not guards, in part because
"they had no professional training or experience in restraining or detaining
individuals, in the use of physical force, or in self-defense techniques"); *accord 55
Liberty Owners Corp.*, 318 NLRB 308, 310 (1995).

greater than that of employees in any department, such as housekeeping.  (JA 439, 878, 881; JA 254, 713.)

In contrast, the Companies' surveillance operators and security officers, unlike the surveillance techs, do perform traditional guard functions.  As the Board found (JA 434-36, 876-78), it is the surveillance operators who monitor the casino floor via the live camera feeds and are responsible for "observing . . . and recording and reporting what occurs."  The Board also found (JA 435, 878) that the Security Department "observes" the Companies' property through its security officers who are assigned to posts throughout the property where they patrol the area observing for problems, and are obligated to engage in situations involving misconduct, including by restraining and handcuffing patrons or escorting persons off the property.  Due to their distinct job duties, surveillance techs cannot fill in for surveillance operators or security officers and vice-versa.[26]

_____

[26]  *Cf. MGM Grand Hotel*, 274 NLRB at 139 (finding employees titled "operators" were guards, in part because, "[s]ignificantly, security officers substitute for the operators for up to 2 hours per day as relief during the operators' breaks and lunch hours").

31

Because the undisputed evidence shows that surveillance techs do not
enforce the Companies' rules against employees or other persons, substantial
evidence supports the Board's findings that they are not statutory guards.

### 4.  The Companies' Challenges to the Board's Guard Determination are Unpersuasive

The Companies' challenges to the Board's determination that the
surveillance techs are not statutory guards are contradicted by the record evidence.
Moreover, because Section 9(b)(3) only prohibits conflicts of loyalty among
guards who may be called upon to enforce rules against their fellow employees, the
Companies have not shown that allowing the surveillance techs to be represented
by the Union would create such divided loyalties.

### a.  The Companies' have not presented any evidence that the surveillance techs are statutory guards

The Companies often reference (Br. 30, 45, 50, 53, 53) "undisputed
evidence" in support of their claims, but the record simply does not establish that
the surveillance techs are guards.  For example, the Companies claim that the
surveillance techs are guards because they have "sole and exclusive responsibility"
over camera placement and access to video feeds (Br. 11, 28).  That assertion,
however, is belied by their own Directors of Surveillance.  Mirage's Director of
Surveillance stated that the techs' camera design and placement is subject to his

approval, and that through the human resources department, he gives direction to the techs about which employees can have access to certain cameras. (JA 548, 684.) Similarly, Bellagio's Director of Surveillance stated that the surveillance techs grant and restrict camera access "at my direction," and that they only know to grant new users access to the surveillance system when he informs the techs about newly hired employees. (JA 96-97.)

Likewise, the Companies' assertion (Br. 29) that the surveillance techs are guards because the safety of its cash depends on their "ongoing vigilance" inaccurately represents their job duties. Again, the techs only maintain the camera systems and have no responsibility regarding cash or other assets. Moreover, they cannot provide "ongoing vigilance" when they are not even working on the property 24 hours per day (in contrast to the surveillance operators and security guards). In fact, to avoid interrupting patrons when installing cameras on the casino floor, the Bellagio techs generally work in the early morning when the casino is at its emptiest. (JA 83.)

Similarly, there is no evidence to support the Companies' assertion that the surveillance techs are guards because they "monitor" and "operate" the security and surveillance systems to be on the lookout for misconduct. (Br. 15, 28, 47, 48.) For example, the Companies' claims (Br. 11, 47) that the techs are the security

department's "eyes for observation" and "operate" the system via their administrative rights are refuted by Mirage's Director of Security, who stated that the security officers – not the surveillance techs – monitor the camera feeds as part of a "visual patrol of an area." (JA 751.) MGM Resorts International's Technical Director – who "oversee[s] all aspects of CCTV, access control, and surveillance [and] security systems" at Bellagio and Mirage – explained that the surveillance techs' "admin rights" mean that they "configure, set up, install, all aspects of setting the system up and getting it . . . ready *to use by the operators*." (JA 348. (emphasis added).) Indeed, the Companies eventually concede this point, when they state (Br. 49) "[o]ne employee cannot both monitor and maintain" the system at the same time.

In addition, as the Board found (JA 443, 885), the additional strike duties that the Companies contemplate for the surveillance techs do not render them statutory guards. To determine whether employees' strike-related duties would qualify them as guards, "the Board will scrutinize the duties and responsibilities assumed by the disputed employees during periods of industrial unrest or strike."[27] The focus of the Board's inquiry is "whether the disputed employee engages in

_____

[27] *Boeing Co.*, 328 NLRB at 130.

guard responsibilities that are not a minor or incidental part of their overall responsibilities."[28]  Bellagio's Vice President of Security presented unrebutted testimony that the only function Bellagio contemplates for surveillance techs during a strike is, "if there's [sic] any repairs [to the cameras], then we get ahold of the surveillance techs and have those fixed."  (JA 301.)  And Mirage's Director of Security said the surveillance techs would be limited to the same role during a strike at his facility, that the surveillance techs would not be present where the striking employees were located, and that in the event of unrest during a strike, he would not call on the surveillance techs and instead he would call the police. (JA 773, 786-87.)

Moreover, there is no merit to the Companies' claim (Br. 28 n.4) that the Board erroneously relied on the Companies' separation of its Surveillance and Security Departments in finding the techs are not guards.  The Board acknowledged that the surveillance techs worked in both departments, but found that their role in installing, altering, and maintaining the cameras and equipment, does not show that they perform guard duties in either department.  (JA 435, 438, 877, 881.)

---

[28] *Id.*

35

### b.  The Companies rely on inapposite precedent that does not support their claim that the surveillance techs are guards

The Companies' cited cases do not support their position that the surveillance techs are guards; its cases show only that guards must, at a minimum, monitor the employer's property and report rule violations, which was not shown here.  Unlike the surveillance techs here, the disputed employees in each of the Companies' cited cases (Br. 51-52) performed obvious guard functions, such as monitoring alarms and reporting triggered alarms to the police, or refusing entry to unauthorized persons until police arrived.[29]  And the additional cases the Companies cite (Br. 51 n.22) simply stand for the established proposition that

---

[29]  *See Peco Energy Co.*, 322 NLRB 1074, 1083 (1997) (janitorial employee was guard when he monitored security cameras, checked people onto property, and reported infractions); *Allen Servs. Co.*, 314 NLRB 1060, 1062 (1994) (employees were guards when they kept unauthorized persons off the property by observing and reporting trespassers to the police); *Rhode Island Hosp.*, 313 NLRB at 347 (security dispatchers were guards when they monitored CCTV system, watched for any situation needing response, and reported such incidents to authorities); *Wells Fargo Alarm Servs.*, 289 NLRB 562, 563 (1988) (alarm service technicians were guards when dispatched on "guard runs" after alarms triggered, inspecting customer's premises for signs of entry, asking individuals for identification, and refusing entry to unauthorized persons until police arrived); *Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 1987 WL 14923 at *1 (S.D.N.Y. Jul. 22, 1987) (dismissing for lack of subject-matter jurisdiction; noting Board's underlying finding that employees who monitored fire-management system and notified authorities were guards).

when an employee performs guard duties and enforces rules, the employee may be considered a statutory guard, regardless of the employee's job title.

Contrary to the Companies' assertion (Br. 48), the Board's decision in *MGM Grand* is consistent with its findings here.  There, employees found to be guards performed clear guard functions when they monitored and reported possible security problems, infractions, and life-endangering situations.[30]  The operators in *MGM Grand* are more analogous to the Companies' surveillance and security operators here – who monitor the casino and grounds via the CCTV system and report suspicious activity – than they are to the surveillance techs – who do not. Indeed, in determining that the operators in *MGM Grand* were guards, the Board explicitly distinguished them from employees (like the surveillance techs here) who are only responsible for "the installation and maintenance of certain electronic security devices" and are "dispatched to the alarm site only when it [i]s already known that the cause of the alarm [i]s some malfunction and generally in circumstances where . . . a guard [i]s already present at the scene."[31]

---

[30]  *MGM Grand Hotel*, 274 NLRB at 140.

[31]  *Id.* at 140 n.8 (distinguishing *American District Telegraph Co*. [128 NLRB 345, (1960)] where those employees installed and maintained "certain electronic security devices provided by ADT to its customers").

37

Furthermore, the Companies' rely on *MGM Grand* (Br. 30, 47) to claim that the techs here "are an extension of those employees" who actually perform guard duties. As the Third Circuit recognized, the Board properly rejects that reasoning: a guard determination cannot "be made on the basis of the functional role of the employee utilizing modern technology. An employee may have an integral role in a protective system but not function as a 'guard' as that term is used in s 9(b)(3)."[32] Similarly, the Companies argue that the surveillance techs play an "integral role" in the security systems and assert "there is literally nothing they cannot do." (Br. 55, 58.) But they mistakenly conflate the importance of the techs' work with guard status, ignoring the established law. Again, employees whose security-related duties are limited to working on the employer's protective equipment are not guards where they are not required to enforce rules to protect property or people.[33]

---

[32] *Wells Fargo Alarm Servs.*, 533 F.2d at 124; *Am. Dist. Tel. Co. (Cleveland, Oh.)*, 160 NLRB at 1138 (rejecting employer's argument that employees who only install and maintain security equipment should be considered guards on the grounds that they are necessary for the proper functioning of the employer's security activities as a whole).

[33] *Am. Dist. Tel. Co. (Cleveland, Oh.)*, 160 NLRB at 1138; *accord Am. Dist. Tel. Co. (Los Angeles, Cal.)*, 83 NLRB at 520; *Am. Dist. Tel. Co. (St. Louis, Mo.)*, 83 NLRB at 1141.

### c. The Companies have not shown there is a potential for divided loyalty

The Companies' claim that the surveillance techs face potential conflicts of interest (Br. 31-32, 53-56) completely misses the mark because none of the possibilities the Companies raise involve enforcing rules against other employees. As the Board and Courts have stated, when enacting Section 9(b)(3) "Congress sought to prevent the conflict of interests that might arise among an employer's guard employees when . . . the guards are called upon *to enforce the employer's security rules* against their . . . colleagues."[34]  Because, as the Board found (JA 438, 880-81), the surveillance techs do not actually enforce any rules against their colleagues, there is no cognizable conflict of loyalty for the purposes of Section 9(b)(3).

For example, the Companies speculate that surveillance techs could go rogue and use their knowledge of the surveillance and security systems to shut them

---

[34] *Boeing Co.*, 328 NLRB at 130 (emphasis added); *see also NLRB v. Brinks, Inc. of Florida*, 843 F.2d 448, 453 (11th Cir. 1988) (noting that Section 9(b)(3) addresses "'the potential for divided loyalty that arises whenever a guard is called upon to enforce the rules of his employer against any fellow union member'" (quoting *Truck Drivers Local Union No. 807 v. NLRB*, 755 F.2d 5, 9 (2d Cir. 1985)); *Local 71*, 553 F.2d at 1373 ("Congress drafted [Section 9(b)(3)] to minimize the danger of divided loyalty that arises when a guard is called upon *to enforce the rules* of his employer against a fellow union member." (emphasis added)).

39

down.  (Br. 54-55.)  But employees have been installing and maintaining their

employer's security alarms and equipment for decades, and the potential for those

employees to have disarmed those systems has always existed.  Yet, the

Companies have cited no case in which that possibility was a conflict of interest

for the purposes of Section 9(b)(3) – presumably this is because the job functions

of installing and maintaining security equipment, standing alone, do not involve

the enforcement of the employer's rules.  For the same reasons, the surveillance

techs' contemplated strike-related duties – which are no different than their regular

job duties of installing and maintaining cameras and related equipment – do not

render them guards under Act.  At bottom, the test for a conflict of interest under

9(b)(3) does not depend on an employee's ability to sabotage its employer's

business through malfeasance, but rather, depends on whether an employee would

be called upon to perform guard functions by enforcing the employer's rules

against other employees.

Similarly mistaken is the Companies' suggestion (Br. 55-56) that the

surveillance techs' limited assistance in special operations would create an

impermissible conflict of loyalty under Section 9(b)(3).  The undisputed evidence

shows that the surveillance techs' only role in those investigations is – at the

direction of management – installing covert cameras, allowing only management-

approved employees access to the video footage, and assisting in retrieving the video footage. At most, the surveillance techs' roles expose them to information about which employees are under investigation. But there is no Board or Court precedent that supports the maxim that mere access to employee disciplinary information confers guard status under Section 9(b)(3) of the Act. Indeed, if the possibility of disclosing the employer's disciplinary investigations were the test for being classified as a statutory guard, then the employees in the Companies' human resources and legal departments – whom the record evidence reveals are also involved in the special investigations and operations (JA 304-05, 580, 675-76) – could be classified as guards as well.

And the Companies' newly raised assertion that certain Nevada Gaming Control Board regulations (Br. 8, 9, 31) would create a conflict of interest is both inapposite and raised too late for this Court to consider it. Because the Companies failed to raise these regulations before the Board, this Court does not have jurisdiction to consider them under Section 10(e) of the Act.[35] Regardless, nothing

---

[35] *Alden Leeds, Inc. v. NLRB*, 812 F.3d 159, 166 (D.C. Cir. 2016) ("Section 10(e) of the [Act] provides that '[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.'" (quoting 29 U.S.C. § 160(e)).

in the Companies' assertion that the gaming regulations require separate surveillance and security departments supports the notion that the surveillance techs' job duties require them to enforce any rules against employees or other persons.

The Companies have not supported their assertions that the surveillance techs enforce any rules. The Board's finding that the Companies' surveillance techs are not statutory guards is supported by substantial evidence and is consistent with controlling precedent. Therefore, the Union is not precluded under Section 9(b)(3) from representing the Companies' surveillance techs.

### B. The Companies Have Not Shown that the Surveillance Techs are Confidential Employees

#### 1. Confidential employees assist or act in a confidential capacity to persons who formulate, determine, and effectuate management policies in labor relations

In the Board's seminal decision on confidential employees, *B.F. Goodrich Co.*,[36] the Board established a labor-nexus test, which the Supreme Court upheld.[37] Under that rule, the Board excludes from bargaining units "only those employees who assist and act in a confidential capacity to persons who formulate, determine,

---

[36] 115 NLRB 722 (1956).

[37] *NLRB v. Hendricks County Rural Elec. Corp.*, 454 U.S. 170 (1981).

*and* effectuate management policies in the field of labor relations."[38]  The Board

has cautioned against "any broadening of the definition of the term "confidential

employee," because a finding that employees are confidential "precludes

employees from bargaining collectively together with other employees sharing

common interests."[39]  "Consequently," the Board stated, "it is our intention herein

and in future cases to adhere strictly to that definition."[40]

     In *NLRB v. Hendricks County Rural Electric Corp.*, the Supreme Court

agreed with the Board in rejecting a broader interpretation of the term "confidential

employee" that would have required any employee to be excluded from union

representation on the basis that they have access to confidential business

information.[41]  Indeed, the Board has found that having access to personnel files,

or access to information that could lead to management's taking disciplinary action

---

[38]  *B.F. Goodrich Co.*, 115 NLRB at 724 (emphasis in original).

[39]  *Id.*

[40]  *Id.*

[41]  *Hendricks*, 454 U.S. at 191 (upholding Board's labor-nexus test and rejecting a "broader definition of confidential employee to include all employees in possession of confidential business information"); *accord Crest Mark Packing Co.*, 283 NLRB 999, 999 (1987); *Fairfax Family Fund, Inc.*, 195 NLRB 306, 307 (1972) ("mere possession of access to confidential business information" insufficient to deny employees representation).

against an individual employee, is not sufficiently labor-policy related to meet the

labor-nexus test.[42]  The Board has also found that having an administrative role in

employee disciplinary matters, such as by typing or preparing employee

disciplinary and termination notices, does not render an employee confidential

under the labor-nexus test.[43]  Instead, for an employee to be categorized as

confidential, they must, in the course of their duties, have regular access to

confidential information concerning the employer's labor-management policies

and negotiations.[44]  As the Supreme Court recognized, the Board's purpose in

---

[42] *Ladish Co*., 178 NLRB 90 (1969) (access to personnel records and ability to bring information to management which could lead to discipline does not show confidential-employee status).

[43]  *Waste Management of Puerto Rico*, 339 NLRB 262, 282 (2003) (typing disciplinary matters, grievances, or other personnel matters does not demonstrate confidential-employee status), *enforced*, 359 F.3d 36 (1st Cir. 2004); *Lincoln Park Nursing & Convalescent Home, Inc*., 318 NLRB 1160, 1165 (1995) (same); *Crest Mark*, 283 NLRB at 999-1000 (rejecting confidential-employee status based on typing notices of termination and hires and filing disciplinary notices, but no involvement in typing correspondence or meeting minutes concerning labor relations).

[44]  *NLRB v. Case Corp*., 995 F.2d 700, 705 (7th Cir. 1993) (rejecting confidential status for employees with access to some confidential information, but no evidence it was relevant to labor relations with union); *see also Foodbasket Partners, Ltd*., 344 NLRB 799, 805 (2005), *enforced*, 200 F. App'x 344, 346 (5th Cir. 2006) (unpublished) (confidential employees are those who, "in the course of their duties, regularly have access to confidential information concerning anticipated changes

excluding confidential employees from union representation is to prevent the

employer's position during collective bargaining from being compromised if the

disputed employee were to give confidential labor-policy information to the union

in advance of negotiations.[45] The party asserting confidential status has the burden

of proving that claim.[46]

> ## 2. The Companies have not met their burden to prove that the surveillance techs are confidential employees

Substantial evidence supports the Board's finding that the Companies have

not shown that their surveillance techs are confidential employees. As the Board

found (JA 438, 880-81), the Companies provided no evidence that the surveillance

---

which may result from collective-bargaining negotiations") (internal citation omitted); *Inland Steel Co*., 308 NLRB 868, 872 (1992) (same).

[45] *Hendricks*, 454 U.S. at 179 (confidential employees excluded from union representation because "management should not be required to handle labor relations matters through employees who are represented by the union with which the company is required to deal and who in the normal performance of their duties may obtain advance information of the company's position with regard to contract negotiations, the disposition of grievances, and other labor relations matters") (quoting *Hoover Co*., 55 NLRB 1321, 1323 (1944)); *see also Case Corp.*, 995 F.2d at 705 (rejecting confidential status where employees were not privy to information that would prejudice employer's bargaining strategy and were not involved in negotiations); *accord Pullman, Inc*., 214 NLRB 762, 763 (1974).

[46] *Crest Mark*, 283 NLRB at 999 (1987); *accord Foodbasket Partners*, 344 NLRB at 805, *enforced*, 200 F. App'x 344, 346 (5th Cir. 2006) (unpublished).

techs act in a confidential capacity to assist supervisors or managers relating to

labor relations matters.  Without any citations to the record, the Companies assert

(Br. 56-58) that the surveillance techs' job duties allow them "unparalleled access"

to "confidential labor relations information" including "confidential bargaining and

negotiation information."  But that assertion is belied by the Companies' own

Directors of Surveillance, to whom the surveillance techs report.  For example,

Dustin Seibold, Bellagio's Director of Surveillance, stated that he never adjusts

grievances, nor does he negotiate labor policy or deal with union representatives,

and that nobody working beneath him (i.e., the surveillance techs) had those duties

either.  (JA 258-59.)  Robert Zeihen, Mirage's Director of Surveillance, gave

similar testimony about his duties and those of his surveillance techs.  (JA 729-30.)

        In addition, there is no merit to the Companies' argument (Br. 56-58) that

the techs are confidential employees because they enable surveillance in

investigations of employee misconduct.  As the Board found (JA 437-38, 880-81),

the Companies presented no evidence that the surveillance techs performed any

role during investigations other than the installation and maintenance of the video

recording system.  The record evidence shows that the techs do not necessarily

know the names of the employees being investigated (JA 677), but even assuming

that they did, that alone does not prove that they act in a confidential capacity with

respect to labor-relations matters or labor policies.  As the Board found (JA 437-38, 880-81), even if the employee investigations for which the techs installed cameras led to the termination of an employee, the record shows that the techs are "not involved in the determination of misconduct, the determination of punishment, the development of policies, or the adjustment of any grievance related to any change of policies or resolution of discipline issued as a result of the investigation."

In *B.F. Goodrich*, for example, the Board found that certain secretaries were not confidential employees when they assisted managers who were charged with general personnel responsibilities including hiring, discharging, disciplining, promoting, and granting raises to employees and handling some employee grievances.[47]  On the other hand, the Board found that a different set of secretaries in *B.F. Goodrich* were confidential employees, because they acted in a confidential capacity as assistants to managers whose responsibilities involved the employer's labor relations policies, such as negotiating union contracts.[48]  Here, as the Board found (JA 438, 880), the techs do not assist managers with matters related to labor

---

[47]  *B.F. Goodrich Co.*, 115 NLRB at 724-25.

[48]  *Id.* at 725.

policy or negotiations.  Indeed, even the techs' managers (the Companies'

Surveillance Directors) themselves are not involved in formulating, determining, or

effectuating the Companies' labor relations policies.  (JA 258-59, 729-30.)

Therefore, the surveillance techs are not confidential employees under the Board's

labor-nexus test in *B.F. Goodrich.*

  Nor is there any merit to the Companies' argument (Br. 58) that the

surveillance techs' knowledge of the Companies' investigations would "violate the

principles articulated in *Hendricks*."  As discussed above, the Court in *Hendricks*

recognized the purpose in excluding confidential employees from union

representation is to prevent the employer's position from being compromised in

determining labor policy issues, not in individual employee misconduct cases.[49]

Indeed, the Court stated in *Hendricks* that "the Board has never followed a practice

of depriving all employees who have access to confidential business information

from the full panoply of rights afforded by the Act."[50]

  Again without any citation to the record, the Companies assert in their brief

(Br. 57-58) that the surveillance techs have access to confidential "strike planning

---

[49] *See supra* note 45.

[50] *Hendricks*, 454 U.S. at 189.

information" and that the Companies rely on the surveillance techs' "confidential understanding of the surveillance system in strike planning."  In fact, when Mirage's Director of Surveillance, Robert Zeihen, was asked whether he had "any understanding of what a surveillance tech's responsibility would be if there were a strike" he responded, "I'm not sure."  (JA 729.)  And James McDaniel, Mirage's Director of Security, never stated that he relied on the surveillance techs' "confidential knowledge" in planning for a strike (JA 771), but said that in the event of a strike the techs would have the same job duties they regularly do: installing and maintaining cameras.  (JA 773.)  Raymond Brown, Bellagio's Vice President of Security, said his techs would be limited to the same role in strike planning in his facility as well.  (JA 301-03).

In addition, contrary to the Companies' arguments (Br. 57-58), *Firestone Synthetic Latex Company*[51] and *Bakersfield Californian*[52] are consistent with the Board's determination here that the surveillance techs are not confidential employees under the labor-nexus test.  In *Firestone*, secretarial employees were deemed confidential where they "assist[ed] in the preparation of, or ha[d] access

---

[51] *Firestone Synthetic Latex Co.*, 201 NLRB 347 (1973).

[52] *Bakersfield Californian*, 316 NLRB 1211 (1995).

to, confidential labor relations information such as the Employer's data in preparation for contract negotiations, minutes of negotiating sessions, and grievance investigation reports."[53]  In *Bakersfield*, the Board found that a certain secretary who, among other things, had access to information involving investigations of employee discipline, was not a confidential employee, noting its longstanding rule that having access to such information does establish confidential status.[54]  Accordingly, the Companies have not met their burden of proof to show that the surveillance techs are confidential employees since they do not assist managers in a confidential capacity with regards to the Companies' labor-relations policies.

### C. The Board acted within its discretion and consistently with its precedent in denying the Companies' motions to dismiss the Union's representation petitions

"Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free

---

[53]  *Firestone*, 201 NLRB at 347-48.

[54]  *Bakersfield Californian*, 316 NLRB at 1212 ("The Board has long held that merely having access to confidential information does not establish confidential status. Nor does the typing of disciplinary matters, grievances, or other material relating to personnel problems render an employee confidential." (internal citations omitted)).

choice of bargaining representatives by employees."[55]  Accordingly, "[t]he scope of [this Court's] review of the Board's rulings regarding the election is 'extremely limited.'"[56]  And when this Court "review[s] an agency's interpretation of its own regulations, [it] do[es] not 'decide which among several competing interpretations best serves the regulatory purpose.'"[57]  Rather, this Court "'give[s] controlling weight to the Board's interpretation of its own rule unless it is plainly erroneous or inconsistent with the regulation itself.'"[58]  This Court will uphold the Board's decisions in representation proceedings if the Board's interpretation of the Act is "reasonable and consistent with applicable precedent."[59]

---

[55]  *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946); *accord NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 767 (1969); *Durham Sch. Servs., LP v. NLRB*, 821 F.3d 52, 58 (D.C. Cir. 2016) (quoting *Serv. Corp. Int'l v. NLRB*, 495 F.3d 681, 684 (D.C. Cir. 2007)).

[56]  *NLRB v. Downtown Bid Servs. Corp.*, 682 F.3d 109, 112 (D.C. Cir. 2012) (quoting *Amalgamated Clothing & Textile Workers Union v. NLRB*, 736 F.2d 1559, 1564 (D.C. Cir. 1984)).

[57]  *Rush Univ. Med. Ctr. v. NLRB*, 833 F.3d 202, 206 (D.C. Cir. 2016) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

[58]  *Id.* at 206-07 (quoting *Alldata Corp. v. NLRB*, 245 F.3d 803, 807 (D.C. Cir. 2001)).

[59]  *Durham Sch. Servs.*, 821 F.3d at 58 (internal quotation marks and citation omitted).

The Board has a statutory duty – set forth in Section 9(c) of the Act – to resolve questions of union representation in the workplace. 29 U.S.C. § 159(c). The Board does so by conducting a secret-ballot election to determine whether a labor organization will represent a bargaining unit of employees. The Board's representation proceedings begin when a union files a petition for certification, in which it requests to become the certified bargaining representative of a unit of employees. 29 C.F.R. § 102.60. The petition itself is a standard form the Board uses to gather preliminary information about the case.[60] It includes the name and location of the employer, name of the labor organization, and the number and types of employees the union seeks to represent. (JA 1, 452.) The form also contains a question (expressed in box 7) about whether the union has requested voluntary recognition from the employer and the employer declined, so that when the Board agent receives the petition form, an "appraisal might be made of the position of the employer with respect to union recognition."[61]

---

[60] *See Advance Pattern Co*., 80 NLRB 29, 30 (1948) (describing the form as a tool to enable the Board to gather basic information about the case).

[61] *Id.*

### 1. The Board reasonably found that the omission on the Union's petitions did not warrant dismissal of these cases

The Board has long held, with court approval, that the failure to answer the question on the form of whether the employer declines to recognize the union is not a jurisdictional bar to proceeding with the representation case, but rather, is a technical omission which can be easily fixed.[62]  As the Board has explained, "despite the fortuity that a petition might have disclosed faulty, incomplete, inaccurate, or otherwise imperfect information," nothing in the Act "compel[s] the Board to stand idly by even though the whole [representation] controversy pointedly demonstrated a need for [the Board] to resolve it."[63]  Indeed, since 1948, under *Advance Pattern* and its progeny, the Board has consistently held that so long as it is clear that there is a need for the Board to resolve a question of union representation in the workplace, the Board will not dismiss a union's petition simply because its form failed to indicate whether it has requested recognition and

---

[62] *NLRB v. Superior Cable Corp*, 246 F.2d 539 (4th Cir. 1957) (holding that union's failure to allege in its petition that it had requested employer to bargain and that employer declined was defect that could be cured); *Dependable Parts, Inc*., 112 NLRB 581, 582 (1955) (failure to indicate on the petition that the employer refused to recognize union was "a technical omission" cured at the pre-election hearing); *accord Advance Pattern Co*., 80 NLRB at 30.

[63] *Advance Pattern Co.*, 80 NLRB at 31; *accord Dependable Parts, Inc*., 112 NLRB 581, 582 (1955).

53

the employer declined.[64]  In *Aria Resort & Casino*, cited in the underlying

decisions here (Board's Denials of Requests for Review), the Board observed that,

"[t]o dismiss the petition under these circumstances would be an abrogation of the

Board's statutory duty . . . to resolve questions concerning representation."[65]

Consistent with that precedent and its statutory mandate to resolve

representations questions, the Board here processed the Union's petitions and

explained that Section 102.61(a) of its Rules, addressing representation petitions,

does not impose any condition requiring a petitioner to demand recognition from

the employer before filing the petition.[66]  (JA 432, 874.)  Further, the Board stated

that the Companies' position is contrary to Board law as expressed in *Advance

Pattern*, described above, rejecting a strictly literal interpretation of language

nearly identical to the current Section 102.61(a)(8).

Furthermore, the Board's processing of the petitions in this case is consistent

with its precedent holding that a technical omission on the form can be easily cured

at the pre-election hearing.  As the Board has previously noted, "the filing of a

---

[64]  *Advance Pattern Co.*, 80 NLRB at 29.

[65]  *Aria Resort & Casino, LLC*, 363 NLRB No. 24, at *1 (Nov. 3, 2015).

[66]  29 C.F.R. 102.61(a).

petition itself constitutes a sufficient demand for recognition" and the question of

whether an employer will voluntarily recognize the union is easily answered if "the

Employer decline[s] to recognize the [union] at the [pre-election] hearing."[67]

Similarly, *Aria Resort & Casino*, cited by the Board in rejecting the Companies'

motions to dismiss (Board's Denials of Request for Review), holds that a union's

"request for recognition and the Employer's declination at the hearing were

sufficient to establish the existence of a question concerning representation."[68]

Here, the Union did request recognition at each hearing and the Companies

declined.  (JA 43, 495.)  Thus, the parties established that the Companies declined

to recognize the Union, and the Board's representation proceedings continued as

they would have had the Union completed box 7 on the petition form in the first

place.  Accordingly, the Board acted reasonably and consistently with controlling

---

[67] *Alamo-Braun Beef Co*., 128 NLRB 32, 35 n.5 (1960); *accord NLRB v. Superior Cable Corp*., 246 F.2d 539, 540 (4th Cir. 1957) (per curiam) (finding that union's failure to allege in its petition that it had requested bargaining and that the corporation had declined was cured by request at the pre-election hearing, which the employer refused); *MGM Grand Hotel, LLC*, 2015 WL 6380396, at *1 (Oct. 22, 2015) ("The Petitioner's request for recognition, and the Employer's declination, at the hearing were sufficient to establish the existence of a question concerning representation."); *Advance Pattern*, 80 NLRB at 35 (finding that "the existence of a real question concerning representation was made fully apparent at the hearing" when the union requested recognition and the employer declined).

[68] 363 NLRB No. 24, at *1.

55

precedent when it denied the Companies' motions to dismiss the Union's petitions

solely on the grounds that the Union failed to indicate on the form whether it had

previously demanded recognition.

### 2. The Companies failed to show any due process violations or prejudice from the Board's rulings

As this Court has held, when a party claims that a Board's ruling in a

representation hearing deprived it of due process, "[t]he burden of showing

prejudice from assertedly erroneous rulings is on the party claiming injury."[69]  The

Companies have not shown any evidence that they suffered any harm, let alone

prejudice, by the Union's omission on the petition forms.  And the Board has

consistently held that there is no prejudice to an employer when a union has failed

to indicate on the form whether it had previously demanded recognition, especially

when the union corrects that omission by making a demand for recognition at the

pre-election hearing.[70]

---

[69]  *Desert Hosp. v. NLRB*, 91 F.3d 187, 190 (D.C. Cir. 1996); *accord Nova S.E. Univ. v. NLRB*, 807 F.3d 308, 315 (D.C. Cir. 2015).

[70]  *Alamo-Braun Beef Co.*, 128 NLRB at 35 n.5 (denying employer's motion to dismiss where union failed to state it had demanded recognition in its petition, noting that "that the filing of a petition itself constitutes a sufficient demand for recognition; that the Employer declined to recognize the [union] at the [pre-election] hearing; and, that there is no showing that the Employer was prejudiced by the alleged defect"); *Dependable Parts*, 112 NLRB at 582 ("The failure to

56

Here, the Companies have not shown any prejudice and their arguments for overturning the Board's ruling are unavailing.  For instance, the Companies assert (Br. 39) that the "statement regarding whether the [union] has requested voluntary recognition" on the petition form "serves a useful purpose [by] putting employers on notice" that the union seeks to represent their employees.  But whether or not the Union completes box 7 on the form, the filing of the petition itself puts the employer on notice that the union seeks to represent its employees, and the *Companies themselves* certainly know whether they will voluntarily recognize the Union.  As discussed above, the petition form's question about voluntary recognition is intended to give the *Board agent* notice and the ability to appraise the employer's position regarding the union before commencing the representation proceedings.  Moreover, here, the Companies have steadfastly fought union representation at every step; voluntary recognition was never a question.

Similarly flawed is the Companies' argument that strict compliance with the voluntary-recognition question on the petition form is necessary because it could "dispens[e] with the need for any Board involvement whatsoever."  (Br. 39.)  As

---

indicate on the petition that the Employer either affirmatively refused to recognize the Petitioner or made no reply is likewise a technical omission which does not prejudice the Employer.").

soon as the Companies received the Union's petitions – regardless of whether box

7 was checked – they could have voluntarily recognized the Union and alerted the

Board agent that the parties had come to an agreement.  Instead, the Companies

chose to engage the Board's process by fully litigating their defenses about guard

status and confidential employees – which is their statutory right under the Act.

But it is specious for the Companies to have litigated their claims through the

Board's process, and now ask this Court to vacate the Board's Orders and restart

these proceedings because of a harmless omission on the petition form.  As the

Fourth Circuit reasoned when rejecting this same argument, "we think that it would

be [a] senseless technicality to hold that the representation proceeding should have

been dismissed and the parties required to initiate a new proceeding, where the

demand and refusal of recognition had been established at the hearing itself." [71]

Furthermore, the Companies' reliance (Br. 41) on *Accardi v. Shaughnessy*[72]

and *NLRB v. Welcome-Am. Fertilizer*[73] is misplaced.  Those cases stand for the

---

[71]  *Superior Cable Corp.*, 246 F.2d at 540.

[72]   347 U.S. 260 (1954).

[73]   443 F.2d 19 (9th Cir. 1971).

58

general propositions that an Agency cannot apply its own regulation "unjustly"[74] or in a way that would deprive a party of a right guaranteed by the regulation.[75] Those cases are inapposite here. As explained above, the Board's regulations describe the general contents of the representation petition but do not require a union to request recognition before filing a petition; thus, there was no departure from Board regulations in the first place. And nothing about the voluntary recognition question on the form conveys a substantive right that implicates the Companies' ability to receive due process before the Board. The Companies do not even claim that they lacked a full and fair opportunity to litigate their guard and confidential-employee arguments. Indeed, the Companies assert no prejudice whatsoever. Accordingly, the Companies' arguments that *Advance Pattern* is no longer good law and that they were denied due process are baseless. (Br. 42)

---

[74] *Welcome-Am. Fertilizer*, 443 F.2d at 20 (once the Board had "completely committed itself" to a self-imposed jurisdictional guideline in litigating a case, it must adhere to that throughout the litigation, otherwise the other party could be denied adequate notice and due process).

[75] *Accardi*, 347 U.S. at 268 (Board of Immigration Appeals denied a deportee the right to a fair hearing to suspend deportation by improperly disregarding its own regulations requiring it to use its own discretion to decide the case rather than implementing Attorney General's prejudgment to deport).

The Companies' reliance (Br. 40) on the Board's decision in *Brunswick Bowling* to argue that the word "shall" in the Board's regulations prohibits any discretion is also unavailing. [76] There, a union failed to submit a timely position statement outlining the precise substantive issues it would raise at the pre-election hearing. [77] In strictly enforcing timeliness requirements, the Board noted that its Rules explicitly preclude the raising of any issue not presented in a position statement. [78] The Board reasoned that in order to give effect to the preclusionary aspect of the new rule, it had to strictly construe the timeliness requirement. [79] Here, Board Rule §102.61(a) states that "[a] petition for certification . . . shall contain" a statement that the employer declines to recognize the petitioner as the employees' representative; yet, as the Board explained (JA 432, 874), neither the Board's rules nor the petition form itself requires a demand for recognition as a mandatory requirement for filing a valid petition. And unlike *Brunswick Bowling*,

---

[76] *Brunswick Bowling Prod.,* 364 NLRB No. 96, 2016 WL 4492374, at *3 (Aug. 25, 2016).

[77] 29 C.F.R. § 102.63(b)(3)(i) (explaining that the statement of position must describe the "issues each party intends to raise at the hearing").

[78] *Brunswick Bowling,* 364 NLRB No. 96, at *3 (citing 29 C.F.R. § 102.66(d)).

[79] *Id.*

60

there is no analogous preclusionary rule requiring the Board to dismiss the petition

if that box on the petition form was not checked.

Although the Companies suggest (Br. 36-39) that the amendment of the

Board's election rules somehow requires a strict hypertechnical approach to

processing petitions, their view is unfounded. The amended rules do not change

anything relevant to the Companies' argument; the pre-2014 petition form

contained the same checkbox regarding a demand for recognition as the new form.

As the Board explained here, "nothing in the Board's recent amendments to its

rules and regulations purports to alter its longstanding practice" in processing

union petitions.[80] While the specific wording on the petition form regarding

voluntary recognition has changed over the years,[81] the same basic information

about a request for recognition has been a longstanding part of the form.

Therefore, the Board's reasoning for declining to dismiss the petitions in *Advance*

*Pattern* is still relevant. Finally, although the Rules contain the phrase "shall

---

[80]    *Aria Resort & Casino, LLC*, 363 NLRB No. 24, at *1 (cited in Board's Denials
of Requests for Review).

[81]    *See Advance Pattern*, 80 NLRB at 29 (at the time, the petition form asked: "Has
the petitioner notified the employer of claim that a question concerning
representation has arisen?" and "Has the employer failed to recognize
petitioner?").

include" when describing the form's contents, Board Rule §102.121 also states that "[t]he rules and regulations in [election proceedings] shall be liberally construed to effectuate the purposes and provisions of the Act." The Company has not shown that the Board acted unreasonably or contrary to controlling precedent by construing the voluntary-recognition question as a technical omission, especially one that can be easily cured at the pre-election hearing.

Here, the Board acted reasonably in denying the Companies' motions to dismiss by applying the same precedent that it has followed for the past six decades. Because the Board's decision was reasonable and consistent with its long-standing precedent, and the Companies have not suffered any prejudice, the Companies have not shown that the Board abused its discretion in denying their motions to dismiss the petitions.

62

## CONCLUSION

At bottom, the Companies urge that this Court deny their employees the representation they voted for on the unsubstantiated grounds that they are either guards or confidential employees under the Act.  The Companies also seek reversal because of an error in the Union's petition forms that did not prejudice anyone. The Board respectfully requests that the Court enter a judgment denying the Companies' petitions for review and enforcing the Board's Orders in full.

*s/* Usha Dheenan

RICHARD F. GRIFFIN, JR.                USHA DHEENAN
   *General Counsel*                             *Supervisory Attorney*

JENNIFER ABRUZZO
   *Deputy General Counsel*              *s/* Marni von Wilpert
                             MARNI VON WILPERT
JOHN H. FERGUSON                            *Attorney*
   *Associate General Counsel*

                              National Labor Relations Board
LINDA DREEBEN                             1015 Half Street, SE
   *Deputy Associate General Counsel*      Washington, DC  20570
                              (202) 273-2948
National Labor Relations Board            (202) 273-2903
February 2017

## ADDENDUM

**National Labor Relations Act**, as amended (29 U.S.C. §151, et seq.)

Section 7 of the Act (29 U.S.C. § 157) provides in relevant part:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

Section 8(a) of the Act (29 U.S.C. § 158(a)) provides in relevant part:

> It shall be an unfair labor practice for an employer—

(1)      to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title].

(5)      to refuse to bargain collectively with the representatives of his employees . . . .

Section 9(b) of the Act, 29 U.S.C. § 159(b) provides in relevant part:

> The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof: *Provided*, That the Board shall not . . . .  (3) decide that any unit is appropriate for such purposes if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

Section 10 of the Act (29 U.S.C. § 160) provides in relevant part:

> (e)    The Board shall have power to petition . . . for the enforcement of such order . . . . No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.  The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive . . . .

**Board's Rules and Regulations**

Board Rule 102.121, 29 C.F.R. § 102.121, provides:

> The rules and regulations in this part shall be liberally construed to effectuate the purposes and provisions of the act.

Board Rule 102.61(a), 29 C.F.R. § 102.61(a), provides:

(a) RC Petitions. A petition for certification, when filed by an employee or group of employees or an individual or labor organization acting in their behalf, shall contain the following:
(1) The name of the employer.
(2) The address of the establishments involved.
(3) The general nature of the employer's business.
(4) A description of the bargaining unit which the petitioner claims to be appropriate.
(5) The names and addresses of any other persons or labor organizations who claim to represent any employees in the alleged appropriate unit, and brief descriptions of the contracts, if any, covering the employees in such unit.
(6) The number of employees in the alleged appropriate unit.
(7) A statement that a substantial number of employees in the described unit wish to be represented by the petitioner. Evidence supporting the statement shall be filed with the petition in accordance with paragraph (f) of this section, but shall not be served on any party.

Board Rule 102.61(a) con't:

(8) A statement that the employer declines to recognize the petitioner as the representative within the meaning of Section 9(a) of the Act or that the labor organization is currently recognized but desires certification under the Act.

(9) The name, affiliation, if any, and address of the petitioner, and the name, title, address, telephone number, facsimile number, and email address of the individual who will serve as the representative of the petitioner and accept service of all papers for purposes of the representation proceeding.

(10) Whether a strike or picketing is in progress at the establishment involved and, if so, the approximate number of employees participating, and the date such strike or picketing commenced.

(11) Any other relevant facts.

(12) The type, date(s), time(s) and location(s) of the election sought.

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

| | |
|---|---|
| BELLAGIO, LLC, d/b/a BELLAGIO LAS VEGAS | ) |
| | ) |
| | ) |
| Petitioner/Cross-Respondent | ) |
| | ) |
| v. | ) Nos. 16-1191, 16-1258 |
| | ) |
| NATIONAL LABOR RELATIONS BOARD | ) Board Case No. |
| | ) 28-CA-170899 |
| Respondent/Cross-Petitioner | ) |

_____

| | |
|---|---|
| THE MIRAGE CASINO-HOTEL, d/b/a THE MIRAGE | ) |
| | ) |
| | ) |
| Petitioner/Cross-Respondent | ) |
| | ) |
| v. | ) Nos. 16-1192, 16-1256 |
| | ) |
| NATIONAL LABOR RELATIONS BOARD | ) Board Case No. |
| | ) 28-CA-170874 |
| Respondent/Cross-Petitioner | ) |

_____

### CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that its final brief contains 13,394 words of proportionally-spaced, 14-

point type, the word processing system used was Microsoft Word 2010.

/s/ Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Dated at Washington, DC                Washington, DC 20570
this 6th day of February 2017         (202) 273-2960

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

| | |
|---|---|
| BELLAGIO, LLC, d/b/a BELLAGIO LAS VEGAS )<br>)<br>)<br>Petitioner/Cross-Respondent )<br>)<br>v. )<br>)<br>NATIONAL LABOR RELATIONS BOARD )<br>)<br>Respondent/Cross-Petitioner )<br>_____ )<br>THE MIRAGE CASINO-HOTEL, d/b/a THE MIRAGE )<br>)<br>)<br>Petitioner/Cross-Respondent )<br>)<br>v. )<br>)<br>NATIONAL LABOR RELATIONS BOARD )<br>)<br>Respondent/Cross-Petitioner )<br>_____ ) | Nos. 16-1191, 16-1258<br><br>Board Case No.<br>28-CA-170899<br><br><br><br><br>Nos. 16-1192, 16-1256<br><br>Board Case No.<br>28-CA-170874 |

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2017, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570

Dated at Washington, DC
this 6th day of February 2017